## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CABO RESTAURANTS, LP** | § | **Case No.04-40445-H5** |
| | § | |
| *Debtor in Possession* | § | **Chapter 11** |
| | § | |

## FOURTH AMENDED DISCLOSURE STATEMENT
## <u>PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE</u>

**IMPORTANT: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  IT IS NOT BEING PROVIDED TO YOU WITH THE INTENT TO SOLICIT YOUR VOTE OR ACCEPTANCE OF ANY PLAN OF REORGANIZATION. THE DISCLOSURE STATEMENT IS MERELY BEING PROVIDED TO YOU AS A PART OF THE DISCLOSURE STATEMENT APPROVAL PROCESS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3017.**

**[PAGE TO BE REMOVED AFTER DISCLOSURE STATEMENT APPROVED.]**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE:                                        §
                                              §
**CABO RESTAURANTS, LP**                      §                **Case No.04-40445-H5**
                                              §
*Debtor in Possession*                        §                **Chapter 11**
                                              §

## FOURTH AMENDED DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

Fisher & Associates

Bennett G. Fisher
State Bar No. 07049125
T. Josh Judd
State Bar No. 24036866
1800 Two Houston Center
909 Fannin Street
Houston, Texas  77010
*Tel*: (713) 223-8400
*Fax*: (713) 609-7766
*Attorneys for the Debtor in Possession*

Dated: February 2, 2005

## TABLE OF CONTENTS

I.  INTRODUCTION  ................................................................................. 5

    A.  PRELIMINARY STATEMENT  .................................................. 5

        (1.0)  PURPOSE OF DISCLOSURE STATEMENT  ..................... 7
        (1.1)  EXPLANATION OF CHAPTER 11  ............................................ 7
        (1.2)  PROCEDURE FOR FILING PROOFS OF CLAIM AND
               PROOFS OF INTEREST  ................................................ 9
               (a)  BAR DATE FOR FILING ALL PROOFS OF
                    CLAIM  ................................................ 9
               (b)  EFFECT OF AMENDMENTS TO SCHEDULES ............. 10
               (c)  EXECUTORY CONTRACTS AND UNEXPIRED
                    LEASES  ................................................ 10
        (1.3)  ACCEPTANCE OF THE PLAN  ............................................ 10
        (1.4)  SOLICITATION  ................................................ 10
        (1.5)  REQUIREMENT OF DISCLOSURE STATEMENT  ........... 11
        (1.6)  LIMITATION OD DISCLOSURE STATEMENT  ....................... 11

II.  DETAIL INFORMATION  ........................................................ 11

    A.  OVERVIEW OF DEBTOR  .................................................... 11
    B.  HISTORY OF BUSINESS  ................................................ 13
    C.  EVENTS LEADING TO CHAPTER 11  ................................................ 14
    D.  POST PETITION ACTIVITIES OF THE DEBTOR  ....................... 15
    E.  OPERATIONS  ................................................ 16
    F.  OVERVIEW OF RECENT YEARS' OPERATION  .................................. 17
    G.  ASSETS OF THE ESTATE  ................................................ 18

        (1.0)  FURNITURE & FIXTURES  .................................................. 18
        (1.1)  INTELLECTUAL PROPERTY  ............................................ 19
        (1.2)  LICENSING/ROYALTY FEES  ............................................ 19
        (1.3)  CASH AND CASH EQUIVALENTS  ............................................ 21
        (1.4)  ACCOUNTS RECEIVABLES  ............................................ 21
        (1.5)  INVENTORY  ................................................ 21

    H.  LIABILITIES OF THE DEBTOR  ............................................ 22
        ADMINISTRATIVE EXPENSES  ............................................ 22
        DISCLAIMER  ................................................ 24
    I.  LIQUIDATION ANALYSIS AS OF OCTOBER 31, 2004  ....................... 24
    J.  LEASES/EXECUTORY CONTRACTS  ............................................ 26
    K.  TAX CONSIDERATIONS  ................................................ 27
    L.  OBJECTIONS TO CLAIMS  ................................................ 27

M.  PREFERENCE ACTIONS  .................................................................... 27
N.  ANTICIPATED FUTURE OF THE DEBTOR  .................................... 28
O.  LITIGATION  ............................................................................... 28
P.  AFFILIATES  ................................................................................ 28
Q.  OTHER ACTIONS  ....................................................................... 29

III.  THE PLAN  ............................................................................................ 29
A.  SUMMARY OF PLAN  ................................................................. 29
B.  CLASSIFICATION OF CREDITORS  .............................................. 30
C.  TREATMENT OF VARIOUS CLASSES  ........................................... 30

IV  GENERAL CONSIDERATIONS IN VOTING TO ACCEPT THE
PLAN .................................................................................................... 31

A.  PROJECTIONS  ........................................................................... 31
B.  ALTERNATIVES TO THE PLAN  .................................................. 32
C.  ADDITIONAL SPECIFIC CONSIDERATIONS IN VOTING  ........... 33

V.  RELEVANT INFORMATION - FURTHER INFORMATION  ...................... 33

VI.  CONCLUSION  ..................................................................................... 34

## SUMMARY OF DEBTOR'S PLAN OF REORGANIZATION

Cabo Restaurants, L.P., a Texas limited partnership, as debtor-in-possession in the above referenced Chapter 11 Case, proposes the following Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code.  The Plan proposes that an investor will contribute $270,000 to the Debtor in consideration of an issuance of all of the equity of the Debtor (the equity holdings of the Debtor as of the Petition Date will be canceled).  Those funds will be used to pay down the AMRESCO secured debt ($150,000) and to pay administrative claims of the debtor ($60,000) and the balance to be used for working capital in order to promote the restaurant, change the menus and otherwise be held for the reasonable needs of the business including possible slack periods, especially with respect to expected road construction in 2005.  In addition, the investor will establish a line of credit of $50,000, for the benefit of the Reorganized Debtor.

TO THE UNITED STATES BANKRUPTCY COURT, CREDITORS AND PARTIES IN INTEREST:

# I. Introduction

**A.      Preliminary Statement**

On July 26, 2004 (the "Petition Date"), Cabo Restaurants, L.P. ("Cabo") filed its voluntary petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  The case has been pending before the Honorable Karen K. Brown, United States Bankruptcy Judge.  Since the Petition Date, the Debtor has operated its business as debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

This Fourth Amended Disclosure Statement (the "Disclosure Statement") is submitted by the Debtor pursuant to Section 1125 of the Bankruptcy Code in connection with the Debtor's Fourth Amended Plan of Reorganization dated February 1, 2005 (the "Plan").  A copy of the Plan is attached to the Disclosure Statement as Exhibit A.  For purposes hereof, any term used in this Disclosure Statement (regardless of capitalization), and not otherwise separately defined herein, shall have the meaning ascribed to it in the Plan or in Section 101 of the Bankruptcy Code.

On [_____], 2005, after notice and a hearing, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes of claimants and equity holders entitled to vote pursuant to the Plan to make an informed judgment on whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT IS NOT A FINDING BY THE COURT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE AND COMPLETE, NOR IS IT AN INDICATION BY THE COURT REGARDING THE CONFIRMABILITY OR FAIRNESS OF THE PLAN.**

CREDITORS SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN CAREFULLY TO DETERMINE WHICH CLASS THEIR CLAIMS ARE CLASSIFIED AND HOW THEIR CLAIMS ARE TREATED UNDER THE PLAN. CLASSES 1, 2, 3, & 4 ARE IMPAIRED UNDER THE PLAN AND THEREFORE ARE ENTITLED TO VOTE ON THE PLAN. CLASS 5 & 6 ARE IMPAIRED UNDER THE PLAN; HOWEVER, IT IS NOT PROVIDED FOR UNDER THE PLAN AND THEREFORE NOT ENTITLED TO VOTE ON THE PLAN. A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT. EACH CREDITOR IN THE CLASS ENTITLED TO VOTE SHOULD PROPERLY COMPLETE THE BALLOT AND RETURN IT TO THE COUNSEL FOR THE DEBTOR AS INSTRUCTED ON THE BALLOT.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ASSETS, THE PAST OPERATIONS OF THE DEBTOR, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT . THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR, HAVE BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, THE DEBTOR'S BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN. THE DEBTOR MAINTAINS AN ACCRUAL BASIS OF ACCOUNTING.

THE DEBTOR COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS, CONTRACTS BETWEEN THE DEBTOR AND THIRD PARTIES, FINANCIAL STATEMENTS OF THE DEBTOR, MONTHLY OPERATING REPORTS, THE DEBTOR'S TAX RETURNS, AND OTHER BUSINESS RECORDS.

THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION

PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

NEITHER THE DEBTOR NOR COUNSEL FOR THE DEBTOR CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.    NEITHER THE DEBTOR NOR COUNSEL HAS VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.

IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

      1.0      Purpose of Disclosure Statement

The Purpose of this Disclosure Statement is to provide sufficient information about the Debtor to enable the holders of impaired claims against the Debtor to make an informal decision with respect to acceptance or rejection of the Plan.  This Disclosure Statement should be read in its entirety prior to voting on the Plan.  This Disclosure Statement describes various transactions contemplated under the Plan.  No solicitation of any vote for or against the Plan may be made except as is consistent with this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor or its business other than the information contained in this Disclosure Statement.  Each creditor, interest holder or other party in interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and to consult legal or other counsel, if necessary, to understand the Plan and its effects, including possible tax consequences, before voting on the Plan.

      1.1      Explanation of Chapter 11

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code.  Upon the commencement of a Chapter 11 case, section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under Chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor and its creditors and equity holders.  Confirmation of a plan of reorganization is the primary purpose of a reorganization case under Chapter 11 of the Bankruptcy Code.  A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor.  Generally, a claim against a debtor arises from a normal debtor/creditor transaction, such as a promissory note or a trade credit

relationship, but may also arise from other contractual arrangements or from alleged torts.  An interest in a debtor is held by a party that owns all or part of the debtor, such as a shareholder, member (of a limited liability company) or limited or general partner.

After a plan of reorganization has been filed with the bankruptcy court, it must be accepted by holders of impaired claims and/or interests in the debtor.  Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets and the plan of reorganization to creditors and equity holders before acceptances of that plan may be solicited.  This Disclosure Statement is being provided to the holders of claims against, or interests in, the Debtor to satisfy such requirements of section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that the creditors and shareholders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class.  While courts have disagreed on the proper method to be used in classifying creditors and shareholders, a general rule of thumb is that creditors with similar legal rights are placed together in the same class and that the shareholders with similar rights are placed together in the same class.  For example, all creditors entitled to priority under the Bankruptcy Code might be placed in one class, while all creditors holding subordinated unsecured claims may be placed in a separate class.  Generally, each secured creditor will be placed in a class by itself because each such creditor usually has a lien on distinct property and therefore has distinct legal rights.

The Bankruptcy Code does not require that each claimant or shareholder vote in favor of the Plan for the court to approve the Plan.  Rather, the Plan must be accepted by each class of claimants and shareholders (subject to an exception discussed below).  A class of claimants accepts the Plan if, of the claimants in the class who actually voted on the Plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the Plan.  For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000, then for such class to have accepted the Plan, six or more of those creditors must have voted to accept the Plan (a simple majority), and the claims of the creditors voting to accept the Plan must total at least $666,667 (a two-thirds majority).

If there is not a dissenting class, the test for approval by a Court of a Chapter 11 Plan (i.e., confirmation) is whether the Plan is feasible and is in the best interest of creditors and interest holders.  In simple terms, a Plan is considered by the Court to be in the best interest of creditors and interest holders if the Plan will provide a better  recovery to the creditors than they would obtain if the Debtor were liquidated and the proceeds of liquidation were distributed in accordance with bankruptcy liquidation priorities.  In other words, if the Plan provides creditors with money or other property of a value exceeding the probable distributions in liquidation bankruptcy, then the Plan is in the best interests of creditors.  The Court, in considering this factor, is not required to consider any alternative to the Plan other than bankruptcy liquidation.

In considering feasibility, the Court is only required to determine whether the obligations of the Plan can be performed.  This entails determining: (l) the availability of cash for payments required at confirmation; (2) the ability of the Debtor to generate future cash flow sufficient to make

payments called for under the Plan and to continue in business; and (3) the absence of any other factor which might make it impossible for the Debtor to accomplish what is proposed in the Plan.

The Court may confirm the Plan even though not all classes of claims and interests vote to accept the Plan. In this instance, the Plan must be accepted by at least one "impaired" class of claims, without including any acceptance of the plan by an insider. Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim as to which legal, equitable, or contractual rights are altered under a Plan is deemed to be "impaired".

If all impaired classes of claims and interests under the Plan do not vote to accept the Plan, the Debtor is entitled to request that the Court confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. These "cramdown" provisions permit the plan to be confirmed over the dissenting votes of classes and/or interests provided that at least one impaired class of claims votes to accept the Plan <u>and</u> the Court determines that the Plan does not discriminate unfairly <u>and</u> is fair and equitable with respect to each impaired, dissenting class of claims and interests.

**THE DEBTOR BELIEVES THAT THE PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF SECTION 1129(a) AND/OR, IF NECESSARY, SECTION 1129(b) OF THE BANKRUPTCY CODE.**

Confirmation of the Plan makes the Plan binding upon the Debtor, the Reorganized Debtor, Creditors, equity holders and other parties in interest irrespective of whether they have filed proofs of claim or voted to accept the Plan.

    1.2    <u>Procedure for Filing Proofs of Claim and Proofs of Interest</u>

    (a)    Bar Date for Filing of All Proofs of Claim (Other Than Administrative Claims) and Proofs of Interest

To participate in the payments and other distributions under the Plan, a creditor must have an allowed claim against, and an interest holder must have an allowed interest in the Debtor. In other words, if a creditor or interest holder agrees with the amount of the claim or interest as scheduled by the Debtor, and that claim or interest is not listed in the Schedules as being disputed, contingent or unliquidated, it is not necessary that a separate proof of claim or proof of interest be filed.

Claims or interests that are unscheduled, or which are scheduled as disputed, contingent or unliquidated, or which are scheduled in an amount that varies from the amount claimed by the creditor or interest holder shall be recognized and allowed only if a proof of claim or interest was timely filed. The deadline for filing a proof of claim in this case was November 24, 2004 (the "Bar Date").

(b)     Effect of Amendments to Schedules

If the Debtor amend downward any claim or interest shown on the schedules, the affected claimant or interest holder must be notified and will be given 30 calendar days from the date of the mailing of such notice to file a proof of claim or proof of interest if the affected claimant or interest holder so desires.

(c)     Executory Contracts and Unexpired Leases

A party to an executory contract or lease that is rejected by the Debtor under the Plan (see Article 11 of the Plan) must file for damages resulting from such rejection within 30 calendar days after the confirmation date.  Claims allegedly arising from lease rejections made prior to the Bar Date should have been filed prior to the Bar Date.  For a detailed description of the Debtor's leases and executory contracts see roman numeral II, section J below.

1.3     Acceptance of the Plan

The Bankruptcy Court will set a hearing on acceptance of the Plan.  A creditor may vote to accept the Plan by filling out and mailing the ballot which is provided with this Disclosure Statement (a sample is attached hereto as Exhibit "B", but for purposes of voting, you should use the separate ballot sheet provided with your Plan and Disclosure Packet) to Bennett G. Fisher, Fisher & Associates, 1800 Two Houston Center, 909 Fannin Street, Houston, Texas 77010.  Whether a creditor votes on the Plan or not, the creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of creditors and is confirmed by the Court.

Absent objection, any claim timely filed is deemed Allowed.  However, absent an affirmative act constituting a vote accepting or rejecting the Plan, a nonvoting creditor and that creditor's claim will not be included for purposes of determining whether the requisite number of votes is obtained. (Allowance or disallowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will not be allowed or disallowed for distribution purposes.)

For the Plan to be accepted by creditors, a majority in number and two-thirds in amount of claims filed and allowed (for voting purposes), and actually voting, of each affected class of creditors must vote to accept the Plan.  You are, therefore, urged to fill out, date, sign and promptly mail the enclosed ballot.  Please be sure to properly complete the form and legibly identify the name of the claimant.

1.4     Solicitation

The Debtor may solicit your vote.  No one soliciting votes shall receive any compensation for any solicitation.  No representations concerning the Debtor or the plan of reorganization are authorized other than those set forth in this Disclosure Statement.   Any representations or inducements made by any person to secure your vote other than those contained in this Disclosure Statement should not be relied upon, and such representations or inducements should be reported

to counsel for the Debtor, who shall deliver such information to the Bankruptcy Court.

    1.5    <u>Requirement of Disclosure Statement</u>

Pursuant to the terms of the Code, this Disclosure Statement has been presented to and approved by the Bankruptcy Court.  Such approval is required under the Code to provide assurance that this Statement contains information adequate to enable the holders of claims to make an informed judgment about the Plan.  Court approval does not, in any way, constitute a judgment by the Court as to the desirability of the Plan or as to the value of any consideration offered thereby. Interested parties are referred to Section 1125 of the Bankruptcy Code (11 U.S.C.A. §1125).

    1.6    <u>Limitation of Disclosure Statement</u>

The Debtor has prepared the Disclosure Statement in order to present that information which, in the opinion of Debtor, is material, important and necessary to an evaluation of the Plan.  The information is intended to be used solely for the use of known creditors of the Debtor, and accordingly, may not be relied upon for any purpose other than the determination of how to vote on the Plan.  In addition, materials contained in this Disclosure Statement are not intended to be adequate for the formation of a judgment by any creditor as to the preferability of any alternative to the Plan.  Materials referring to alternatives to the Plan are limited by both the practical considerations of space and the opinion of the Debtor regarding these alternatives.

Certain portions of this Disclosure Statement are taken from other, readily accessible instruments or documents, or are digests of other instruments or documents.  While the Debtor has made every effort to retain the meaning of these instruments, it urges that any reliance on the contents of these instruments should depend on a thorough review of the instruments themselves. The foregoing described source documents include, without limitation, the Monthly Operating Reports of the Debtor, notes, leases, and security agreements in favor of various creditors, as well as the tax returns and financial statements of the Debtor. The Debtor maintains its books and records on an accrual basis of accounting.  Cappellen & Associates, L.P., an accounting firm specializing in the restaurant industry, serve as the Court approved accountants in this case.

## II.  DETAIL INFORMATION

**A.**    **Overview of Debtor**

Name of Debtor:          Cabo Restaurants, L.P., a Texas limited partnership
                         d/b/a Cabo
                         d/b/a Cabo, the Original Mix Mex Grill
                         d/b/a Cabo Travis
                         a/k/a Cabo Restaurant

General Partner of Cabo:          Roberson Hospitality, Inc. ("RHI")
419 Travis Street
Houston, Texas 77002

| Limited Partners of Cabo | Initial Capital Contribution | Sharing Ratio |
|---|---|---|
| Houston Economic Opportunity Fund II, L.P. 333 Clay Street, Suite 3800 Houston, Texas 77002 | $2,225,000.00 | 90% |
| Michael Roberson 419 Travis Street Houston, Texas 77002 | $    50,000.00 | 5% |
| Dewey Jefferson 12114 Manorgate Houston, Texas 77031 | $        10.00 | 1.5% |
| Kim Champion 130 Surf Court, No. 117 Houston, Texas 77058 | $        10.00 | 1.5% |
| Anthony Roberson 419 Travis Street Houston, Texas 77002 | $        10.00 | 1.5% |
| TOTAL: | $2,300,040.00 | 100% |

2003 Gross Revenue       $4,596,373 (two restaurants)

2004 Revenue (projected)       $2,900,000 (one restaurant)

Fiscal Year-end:       December 31

| Shareholders of RHI | Initial Capital Contribution | Percentage Ownership |
|---|---|---|
| Michael Roberson | $1,000 | 100% |

President of RHI         Michael Roberson
419 Travis Street
Houston, Texas 77002

Vice President of RHI             Anthony Roberson
                                      419 Travis Street
                                      Houston, Texas

Treasurer of RHI              Dewey Jefferson
                                      12114 Manorgate
                                      Houston, Texas 77031

## B.    History of Business

In September 2000, Cabo purchased (the "Purchase") Cabo Shepherd, Inc., and Cabo Travis, Inc., from BFX Hospitality Group, Inc. ("BFX"), and American Food Classics, Inc. ("AFCI") for $3,523,369.00 (the "Purchase Price"). AFCI is an indirect parent of BFX and an indirect third tier subsidiary of BFX, and was the owner of certain intellectual property (as described below) purchased by the Debtor. At the time of the Purchase, Cabo Shepherd, Inc., operated a restaurant in Shepherd Plaza at 2187 Portsmouth, Houston, Texas ("Cabo-Shepherd"), and Cabo Travis, Inc., operated a restaurant at 419 Travis Street, Houston, Texas ("Cabo-Travis").

ALLOCATION OF PURCHASE PRICE

| | | |
|---|---|---|
| Cash | $ | 7,837 |
| Deposits | $ | 10,396 |
| Rent | $ | 10,124 |
| Insurance | $ | 2,795 |
| Taxes | $ | (2,753) |
| Cabo-Shepherd Inventory | $ | 6,947 |
| Cabo-Travis Inventory | $ | 22,226 |
| Cabo-Shepard Equipment and Leasehold Improvements | $ | 465,797 |
| Cabo-Travis Equipment and Leasehold Improvement | $ | 2,500,000 |
| Intellectual Property | $ | 500,000 |
| | | |
| TOTAL: | $ | 3,523,369 |

The Houston Economic Opportunity Fund II, L.P. ("HEOF"), is a limited partnership that invests equity capital in women and minority owned businesses. Enron Investment Partners ("EIP"), a wholly owned subsidiary of Enron Corp., was the general partner and a consortium of banks are the limited partners. Due to the collapse of Enron, PaceSetter Capital Group, Inc., is serving as the general partner to HEOF. HEOF provided substantially all of the Debtor's initial equity funding. Enron Investment Partners was/is the general partner of HEOF and, upon information and belief, provided most, if not all, of HEOF's initial investment.

In order to fund the balance of the Purchase Price, the Debtor obtained a loan in the principal amount of $1,500,000.00 from AMRESCO Commercial Finance, LLC.[1] ("AMRESCO"). The loan is secured by a promissory note and a pledge of substantially all of the Debtor's assets (the "AMRESCO Note"). The scheduled monthly payment is approximately $22,350.

The Cabo-Travis Premises has been recognized for its historical significance by the National Register of Historic Places. In 1995, by ordinance, the Premises received a historical designation by the City of Houston. The historical designation limits the property owner's ability for exterior alteration, new construction, or relocation and demolition of the Premises. It does not, however, limit the Debtor's use of the interior of the Premises.

A material part of the Debtor's original business plan was to expand the Cabo brand. At the time of the Purchase, Cabo-Shepherd was not financially viable, however, in order to maintain brand recognition, the Debtor continued to operate Cabo-Shepherd until a another Cabo location was prepared to open. In early 2001, the Debtor entered into a lease agreement with Kensinger Properties Limited for the lease of the real property located at 6025 Richmond Avenue, Houston, Texas ("Cabo-Richmond"). Profits from Cabo-Travis and the assets of Cabo-Shepherd, along with additional investment from HEOF, were to be used to finance the Cabo Richmond location. Unfortunately, during the Cabo-Richmond build-out, Tropical Storm Allison hit the Houston area and damaged both Cabo-Travis and Cabo-Richmond. The loss of business following the storm, together with the costs of repairs, followed by a dramatic downturn in the economy subsequent to the events of September 11, 2001 and the collapse of Enron, delayed the opening of Cabo-Richmond by four months. Finally, in December 2001, Cabo-Richmond opened its doors. As planned, the Debtor closed Cabo-Shepherd on or about September 12, 2001.

## C.     Events Leading to Chapter 11

Cabo-Richmond operated for a period of approximately 18 months. Initially, Cabo-Richmond enjoyed success as a popular establishment among middle and upper class African Americans. Cabo-Richmond then began experiencing problems from a customer base, a general downturn of business on the "Richmond Strip," and nightclub type revenues but with a restaurant cost structure. Cabo-Richmond closed its doors in December 2003. Subsequently, a judgment was taken against the Debtor by Kensinger Properties Limited in the amount of $350,000 for breach of the Cabo-Richmond lease.

The Debtor has continued the successful operation of Cabo-Travis. Cabo-Travis caters to a downtown lunch crowd, after work happy hours, late night party goers, and event crowds from the Toyota Center and Minute Maid Park. Cabo-Travis continues to average sales of approximately

---

[1]         AMRESCO Commercial Finance, LLC, a Delaware limited liability corporation (formerly known as AMRESCO Commercial Finance, Inc., a Nevada corporation) appears as agent for Wells Fargo Bank, N.A. (formerly Wells Fargo Bank Minnesota, N.A. and Norwest Bank Minnesota, N.A.) as Indenture Trustee, and Wachovia Trust Company, N.A. (formerly First Union Trust Company, N.A.), as Owner Trustee of the ACLC Business Loan Receivables Trust 2000-1.

$225,000.00 per month during its peak season of March through August, and $175,000 through $200,000.00 during its off season. However, during the fall of 2004, the Debtor benefitted from the late season resurgence of the Houston Astros, and the increased downtown crowds that resulted from the Astros playoff success.

The Debtor suffered significant financial distress as a result of downtown street construction, flooding from Tropical Storm Allison, the loss of the financial support of it benefactor, Enron, the loss of thousands of jobs downtown after the collapse of Enron, Arthur Anderson, and Dynegy, as well as a large debt load.  Beginning in October 2003, the Debtor was unable to make their monthly AMRESCO Note payment.  After Cabo-Richmond closed, Cabo-Travis became overburdened with a note payment that was designed to be paid by two operating restaurants.  On January 19, 2004, the Debtor and AMRESCO entered into a Forbearance Agreement, in which the Debtor agreed to an accelerated balance of the AMRESCO promissory note.  The Debtor was unable to fulfill the requirements of the Forebearance Agreement and AMRESCO threatened foreclosure.

Finally, in July 2004, Kensinger Properties Limited filed a motion (in state court) to appoint a receiver for the Debtor.  To avoid a complete loss of their business, the Debtor filed for protection pursuant to Chapter 11 of the Bankruptcy Code on July 26, 2004.

## D.     Post Petition Activities of the Debtor

Since the Petition Date, the Debtor has continued to operate under the management of Michael Roberson and Anthony Roberson (together, the "Robersons").  Shortly after the filing of the  Bankruptcy Petition, the Robersons held meetings with the staff and other members of management in order to generate confidence and a sense of urgency to reign in any unnecessary costs and expenses.  July sales, initially buttressed by the swell of guests for the Major League Baseball All Star Game festivities, then settled into a more typical summer pattern, which continued through August.  September traditionally reflects lower sales than the summer months, and this year was no exception.  October, however, was a pleasant surprise, as the Astros shocked the sports world by reaching the playoffs and then winning the first round playoff series.  Only a miraculous catch by the Cardinals' all-star center fielder kept the Astros out of the World Series, and the Debtor from another windfall week of above-average sales.

In November, record rainfall significantly affected sales, and Cabo adjusted by reducing its management staff, reducing the amount of hours for off-duty policemen (security), eliminating four (4) supervisor shifts per week, and expanding the kitchen manager's duties to cooking during slack periods (typically, 2:00 P.M. to 5:00 P.M.).  In addition, in order to better control inventory, smaller, but more frequent liquor purchases have replaced larger orders, in order to manage the costs of less popular brands.

Shortly after the Debtor filed its Bankruptcy Petition, a hearing was held regarding the use of cash collateral.  As AMRESCO is the largest secured creditor, the Debtor and AMRESCO reached agreement with respect to the use of its cash collateral.  Payments of $6,000 on the 3rd and 18th day of each month have been made to AMRESCO since mid August.  The Monthly Operating

Reports, attached as Exhibit "C," contain a summary of Debtor's post-petition income and expenses, cash flow and balance sheets as of the last day of each month.

The Debtor's current management has significant concerns regarding the effect of downtown street construction that is scheduled to begin on Travis Street in early 2005. According to the Downtown/Midtown Transit Street Project, there will be a total reconstruction of Travis Street, the underground utilities, and storm drains. Unfortunately, the storm drain reconstruction that will be performed directly in front of the Premises is in the middle of the street and will involve large materials and deep excavation. Limited pedestrian and vehicular access will be maintained. In the words of Connie Roebuck, the Community Outreach Representative of the Downtown/Midtown Transit Street Project, the reconstruction "is not going to be quick and easy for anyone."

## E.    Operations

The Debtor provides its customers with a pleasant, moderately priced alternative to fast food chains and conventional full-service restaurants. The Debtor's menu is "a la carte" and offers a unique variety of "mix-mex" meals, including chicken, beef, fish, and shrimp served as entrees, burritos, tacos, tortas, and fajitas. A complete menu can be found at www.cabomixmex.com/menu.asp. Each per customer check averages approximately $12. Management believes that the "Cabo" name is widely recognized in the Houston area, and places emphasis on consistent food quality, variety, cleanliness and service, which has led to a loyal guest base.

<u>Restaurant Management and Employees.</u> The Debtor is operated under the supervision of two general managers and three assistant managers. The Debtor employs approximately 60 workers, of whom approximately half are part time workers. For administrative purposes, employees are divided up into two groups - one comprises employees who work on an hourly basis (the "Hourly Employees") and the  other compromises salaried employees, including management (the "Salaried Employees"). An average bi-weekly payroll for the Hourly Employees is approximately $22,000.[2] Salaried employees, which numbers approximately five (5), are also paid bi-weekly, and an average payroll for Salaried Employees is approximately $9,000.[3]

<u>Working Capital Requirements.</u> The Debtor's sales are collected immediately in cash or within several days from credit card companies. Funds available from cash sales are not needed to finance receivables and are generally not needed immediately to pay for food, supplies and certain other expenses of the restaurant. Historically, the Debtor's business operations have not required large amounts of working capital, which is common among similar restaurant companies. However,

---

[2]Some of Debtor's hourly employees receive tips. The approximate average bi-weekly Hourly Employee payroll including tips is $22,000 (approximately $6,000 representing tips).

[3] The Debtor uses an employee leasing company named Preferred Restaurant Services for its salary/management personnel. Preferred Restaurant Services provides its "employees" with better benefit programs, at a lower price, than could otherwise be provided by the Debtor.

shortly before filing for Chapter 11, the Debtor proactively adopted a C.O.D. policy with many of its vendors in order to ease the transition into the bankruptcy reorganization process and to avoid costly DIP financing.  The short term result was that the C.O.D. status hurt the Debtor's cash position and the Debtor currently has very little, if any, working capital.

Competition.  The food service industry is highly competitive and is often affected by changes in consumer tastes, economic conditions, and demographic and local traffic patterns.  The Debtor does not have a significant share of the food service market in downtown, Houston.

## F.    Overview of Recent Years' Operations.

The following unaudited tables set forth certain statement of operations data for the fiscal year indicated for the Travis street location only.  The 2004 table is through 10/31.

| Statement of operations data: | 2004(ytd)[4] | 2003 | 2002 | 2001 |
|---|---|---|---|---|
| Sales: | 2,632,861 | 2,485,353 | 2,641,196 | 3,665,528 |
| Costs and Expenses: | | | | |
| Cost of sales (excluding depreciation as a percent of sales) | 28.5% | 26.3% | 25.6% | 22.8% |
| Labor and related costs as a percent of sales | 26.4% | 25.9% | 26.4% | 23.7% |
| Occupancy and other expenses as a percent of sales | 23.6% | 29.5% | 27.8% | 23.6% |
| General and administrative expenses as a percent of sales | 9.6% | 10.1% | 10.9% | 9.2% |
| Depreciation and amortization | 75,204 | 174,219 | 36,062 | 316,107 |
| Total costs and expenses | 2,580,040[5] | 2,452,777 | 2,354,302 | 3,220,166 |
| Operating Income (**EBITDA - Depreciation added back**) | $128,035 | $206,745 | $322,956 | $761,469 |

**EBITDA** is the calculation of **E**arnings **B**efore **I**nterest, **T**axes (as a partnership, this number is -0-), **D**epreciation, and **A**mortization.  The above analysis reflects the operating income of Cabo-Travis only. The note payments to AMRESCO, $22,350 per month, or $268,200 per year, are not included, as it is impossible to determine how much of that debt is attributable to Cabo-Travis and how much is attributable to Cabo-Richmond and/or Cabo-Shepherd.

---

[4] Sales does not include Cabo-Montrose royalty income.

[5] Amount does not include costs attributable to Cabo-Richmond.

| Restaurant units in operation: | | | | |
| --- | --- | --- | --- | --- |
| Beginning of year | 1 | 2 | 2 | 2 |
| Opened | 0 | 0 | 0 | 1 |
| Closed | 0 | 1 | 0 | 1 |
| End of year | n/a | 1 | 2 | 2 |

The average weekly sales during 2004 (through 10/31) were approximately $60,000. However, several extraordinary non-recurring events occurred during 2004 that substantially increased the Debtor's 2004 gross sales and, in turn, average weekly sales. First, the city of Houston hosted the Superbowl and related week-long festivities in late January/early February. The business benefitted greatly from its prime downtown location and gross sales during Superbowl <u>weekend</u> were approximately $140,000.00, which is about 2.5 times average <u>weekly</u> sales. Second, in July the city of Houston hosted the Major League Baseball All Star game. Although sales surrounding the All Star game did not approach the numbers during Superbowl week, the Debtor's sales (specifically, the sale of alcohol) were 2 times the average weekly sales.

## G.      Assets of the Estate

The Debtor owns the "Cabo Concept." For purposes of the Disclosure Statement, the term "Cabo Concept" means and includes collectively: (i) the recipes currently being used by the Debtor, (ii) menu items on the A La Carte Taqueria Menus, and (iii) the following elements of trade dress, taken in the aggregate:

- visual appearance of the exterior and interior
- signage
- interior decor of diamond plate metal countertops and tabletops
- wall CD player
- red diamond dust vinyl barstools
- soda fountain seating
- floor plan and layout
- ala carte menu
- uniforms of staff
- furniture, fixtures and equipment

### 1.0      Furniture & Equipment:

The Debtor owns numerous pieces of equipment required to operate a full service restaurant. Most of the equipment is in average condition, and with the exception of the kitchen equipment and televisions, is unique to the Debtor's trade dress. Attached as Exhibit "C" is a comprehensive list of the equipment and furniture, together with the fair market value. The Debtor believes that the values of the assets are accurate as of October 31, 2004.

1.1     Intellectual Property:

The Debtor owns the following trademarks and/or service marks:

| Trademark | Federal Registration Number | Texas Registration Number | Registration Date |
|---|---|---|---|
| CABO | 2,051,965 | - | 4/15/1997 |
| CABO | - | 56980 | 7/31/1997 |
| CABO, THE ORIGINAL MIX MEX GRILL | 2,051,900 | - | 4/15/1997 |
| CABO, THE ORIGINAL MIX MEX GRILL | - | 54534 | 6/02/1995 |
| MIX MEX | 2,018,232 | - | 11/19/1996 |
| CABO COAST BAR & BROILER | 1,604,146 | - | 06/26/1990 |
| CABO-MONTROSE | 76/509790 | - | 4/28/2003 |

The Debtor owns all right, title, and interest in the above listed marks (collectively the "Cabo Marks").

1.2     Licensing/Royalty Fees

Cabo Montrose, L.P.  The Debtor is a party to a license agreement dated May 15, 2003 (the "Montrose License Agreement"), in which the Debtor granted Cabo Montrose, L.P., a Texas limited partnership ("Montrose Licensee")[6], a non-exclusive license to use the Cabo Marks and Cabo Concept at a single location.  In partial consideration of such license, the Montrose Licensee paid to the Debtor a nonrecurring and non-refundable one time licensing fee in the amount of Fifty Thousand and No/100 Dollars ($50,000.00).  As further consideration, Montrose Licensee shall pay a monthly royalty to the Debtor in the amount of four percent (4%) of the gross sales of the Montrose Licensee's business (the "Montrose Royalty Fee").

---

[6]  The Debtor holds a 67% non-preferred limited partnership interest in Cabo Montrose, L.P.  The general partner of Cabo Montrose, L.P., is Roberson Restauant Group, Inc., a Texas Corporation, owned and operated by Michael Roberson and Anthony Roberson.  Anthony Roberson also holds a .78% limited partnership interest in Cabo Montrose, L.P.

In 2003, the Montrose Licensee began operating a Cabo styled restaurant at 1111 Westheimer Road, Houston, Texas 77006. The Montrose Licensee, due to poor business performance, has been unable to pay the Montrose Royalty Fee and, as of September 31, 2004, owed the Debtor $41,316 in unpaid royalty fees. Due to the current financial condition of the Montrose Licensee, the Debtor believes that the account receivable is uncollectible. Cabo-Montrose ceased operations in December 2004.

Cabo Silverlake, L.P. The Debtor is a party to an August 15, 2003, license agreement (the "Silverlake License Agreement"), in which the Debtor granted Cabo Silverlake, L.P., a Texas limited partnership (the "Silverlake Licensee"), a non-exclusive license to use the Cabo Marks and Cabo Concept at a single location. In partial consideration of such license, the Silverlake Licensee paid to the Debtor a nonrecurring and non-refundable one time licensing fee in the amount of Seventy Five Thousand and No/100 Dollars ($75,000.00). As further consideration, the Silverlake Licensee shall pay a monthly royalty to the Debtor in the amount of four percent (4%) of the gross sales of the Silverlake Licensee's business. Cabo Silverlake, L.P., has not opened a Cabo style restaurant and plans to open the restaurant have been put on hold.

Clear Lake Cool Concepts, L.L.C. The Debtor is a party to an December 12, 2003, license agreement (the "CLCC License Agreement"), in which the Debtor granted Clear Lake Cool Concepts, L.L.C., a Texas limited liability company ("the CLCC Licensee"), a non-exclusive license to use the Cabo Marks and Cabo Concept at a single location. In partial consideration of such license, the CLCC Licensee agreed to forgive a Twenty Three Thousand and no/100 Dollar ($23,000.00) promissory note.[7] As further consideration, the CLCC Licensee shall pay a monthly royalty to the Debtor in the amount of three percent (3%) of the gross sales of the CLCC Licensee's business. Clear Lake Cool Concepts, L.L.C. has not opened a Cabo style restaurant and, upon information and belief, there are no immediate plans to open a restaurant. If the CLCC Licensee fails to open a restaurant within 24 months of the effective date, the CLCC License Agreement may be terminated by the Debtor.

X.J. ESCO Investments, L.L.C. The Debtor is a party to an December 31, 2003, license agreement (the "XJ License Agreement"), in which the Debtor granted X.J. ESCO Investments, L.L.C., a Texas limited liability company (the "XJ Licensee"), six (6) non-exclusive license to use the Cabo Marks and Cabo Concept at separate locations. In partial consideration of such licenses, the XJ Licensee paid to the Debtor a nonrecurring and non-refundable one time licensing fee in the amount of One Hundred Seventy Five Thousand and No/100 Dollars ($175,000.00). As further consideration, the XJ Licensee shall pay a monthly royalty to the Debtor in the amount of three

---

[7] In early 2002, the Debtor became aware that Enron would no longer provide any capital or other assistance to the operations of the restaurants. Because Cabo-Richmond had just opened and Mission Construction (the general contractor) was owed over $400,000.00 in construction costs, the Debtor borrowed money from various sources, including $23,000.00 from Anthony Roberson and $100,000.00 from Xavier Escobar. Anthony Roberson subsequently assigned the $23,000.00 promissory note to Clear Lake Cool Concepts, L.L.C., a company in which he was the sole member. In 2003, the Debtor began to seek additional investment, and in order to remove some of the liability from its books, agreed to grant certain creditors licenses in exchange for forgiveness of debt.

percent (3%) of the gross sales of the XJ Licensee's business.  Pursuant to its terms, the XJ Agreement is assignable.  As of the date of this Disclosure Statement, X.J. ESCO Investments, L.L.C., has not opened a Cabo style restaurant.

The Debtor agrees and stipulates that the intellectual property subject to the XJ License Agreement, the Silverlake License Agreement, the CCLC License Agreement and the Montrose License Agreement (collectively the "License Agreements") is subject to the valid, existing and perfected liens of AMRESCO.  To the extent that the License Agreements are assumed pursuant to the Debtor's Plan or Reorganization, and as a condition of AMRESCO's agreement to modify the principal balance of its loan; 1) the Debtor agrees to execute any and all documents reasonably necessary in order for AMRESCO to perfect its security interest in and to the License Agreements, and 2) the licensees shall execute documents in favor of AMRESCO that: acknowledge AMRESCO's security interest in the license and royalty payments; provide names and addresses of the licensee; and confirm that the Debtor is not in default under the License Agreement.  If the licensee(s) fail to execute such reasonable documents in favor of AMRESCO, the applicable License Agreement(s) shall be rejected on the Effective Date.

     1.3    <u>Cash and Cash equivalents.</u>

As of October 31, 2004, the Debtor held cash or deposit accounts in the amount of approximately $40,000.  In addition, the Debtor has a security deposit totaling approximately $7,475 with its landlord, Reliant Energy, and Lane Equipment Company.

     1.4    <u>Accounts Receivable.</u>

As identified above, the Montrose Licensee owes the Debtor $41,316 in unpaid royalties. The Debtor believes the account is uncollectible.

     1.5    <u>Inventory.</u>

The inventory of the Debtor includes liquor, beer and wine, food and supplies.  The liquor and beer is kept at a minimal level in accordance with the expected needs of the business.  As the liquor regulations prohibit the sale of alcohol by a restaurant except to customers by the drink (or, in the case of wine, by the open bottle for consumption in the restaurant), the liquor, beer and wine inventory has no or little value if the Debtor is liquidated.

The Debtor's food inventory is kept at a level in accordance with the seasonality of the Debtor's business.  The average value of the Debtor's food inventory is approximately $8,900. Supplies include condiments, to go boxes, plastic wares, candy, tea and coffee, napkins, bar supplies and snacks, soft drinks & juices, Perrier, straws, candles, etc. Generally, the restaurant only orders supplies as needed, and the amounts on hand are minimal.  Because many of the Debtor's supplies are brand specific (i.e., the napkins have the Cabo name and logo printed on them) they have little to no re-sale value.  The Debtor does, however, offer cigarettes and cigars for sale, the aggregate value of which is approximately $650.

The Debtor maintains a minimal supply of "Cabo" merchandise for sale, including tee-shirts and hot sauce, the value of which is approximately $600.

## H.    Liabilities of the Debtor

The liabilities of the Debtor are segregated into six (6) classes, plus a separate category for administrative expenses.  Below are descriptions of the classes of liabilities.

Administrative Expenses

Administrative Expense Claims are Claims constituting a cost or expense of administration of the Chapter 11 case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such Claims include the actual and necessary costs and expenses of operating the business of the Debtor in Possession, any indebtedness or obligations incurred or assumed by the Debtor in Possession in connection with the conduct of its business, all cure amounts owed in respect of leases and contracts assumed by the Debtor in Possession, and all compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code.

In this case, expenses of administration, including professional fees of attorneys and accountants have been incurred and to the extent approved by the Court will be entitled to priority pursuant to the Bankruptcy Code.  As of October 31, 2004, counsel for the Debtor had incurred unpaid legal fees and expenses of approximately $31,220.  An additional $15,000 of legal fees are expected. As of October 31, 2004, the accountants for the Debtor had incurred approximately $8,890 in unpaid accounting fees.  An additional $6,000 in accounting fees are expected.  The Debtor incurred US Trustee's fees of $3,750 during the third quarter of 2004 (which were paid), and is expected to incur $3,750 during the fourth quarter of 2004 and the first quarter of 2005, after which the case should be closed.  Together, the legal fees and US Trustee's fees are expected to bring the administrative expenses to a total of approximately $68,620.

Class 1 -- Priority Creditors

Priority Tax Claims are Claims of governmental units for taxes entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  The Texas State Comptroller holds a Priority Tax Claim for sales tax collected from July 1, 2004 to July 26, 2004 in the amount of $21,329.54.  The Internal Revenue Service ("IRS") holds a Priority Tax Claim for unpaid FICA taxes for the quarters ending 12/31/2003, 3/31/2004 and 6/30/2004, in the aggregate amount of $77,768.81.[8]  The Priority Tax Claims will be treated as set forth in the Plan.

---

[8]  Pursuant to the proof of claim filed by the IRS, the IRS also holds a general unsecured claim in the amount of $15,035.09.

Class 2 -- Secured Tax Claims

Secured Tax Claims are Secured Claims which, absent their status as Secured Claims, would be entitled to a priority right of payment pursuant to section 507(a)(8) of the Bankruptcy Code. In this case, Harris County and the City of Houston (collectively, the "City/County") and Houston Independent School District (the "ISD") have statutory tax liens against the personal property of the Debtor. The personal property tax amount due the City/County is, pursuant to the amended proof of claim filed by the City/County, $25,920.24. The personal property tax amounts due to the ISD are $27,905.10. These amounts include 2002, 2003 and 2004 ad-valorem taxes.

Class 3 - Secured Claim of AMRESCO.

On August 30, 2000, Debtor borrowed $1,500,000.00 from AMRESCO Commercial Finance, Inc. However, as an inducement to AMRESCO to make the loan, Debtor executed a promissory note for $1,666,666.67, the additional $166,666.67 amount was attributable to a "credit enhancement amount." The AMRESCO Note is secured by a first lien on Cabo Restaurants, L.P.'s now owned, or to be acquired tangible and intangible property, including a leasehold deed of trust and assignment of leases and rents in the property located at 419 Travis Street. Prior to the filing of the bankruptcy petition, the Debtor defaulted on the AMRESCO Note payments causing the balance of the note to increase substantially (due to a "make whole" premium). AMRESCO and the Debtor previously stipulated that as of the Petition Date, the principal balance on the AMRESCO Note is $1,826,388.32. The AMRESCO Note greatly exceeds the value of the Debtor's assets. For the purposes of this Disclosure Statement, and by agreement with AMRESCO, the Claim is bifurcated into secured and unsecured amounts. On the Effective Date, the principal amount of loans, credit enhancement, fees, including, but not limited to, legal fees and accrued interest, are to be capitalized into a secured note (the "Secured Note"). The Secured Note shall have the initial principal balance, as of the Effective Date, of $1,125,000.00 and shall be the Allowed Secured Claim of AMRESCO. In addition, the Debtor shall make a principal payment in cash, to AMRESCO on the Effective Date, of $150,000. The $481,388.32 balance of the Claim will be treated as a Class 4 Allowed General Unsecured Claim. For a more detailed description of the treatment of AMRESCO'S Class 3 Secured Claim, please refer to Section 4.04 of the Debtor's Third Amended Plan of Reorganization.

Class 4 - General Unsecured Creditors

The Debtor's General Unsecured Claims consist of all General Unsecured Claims against the Debtor other than the claims of the Class 6 Subordinated Unsecured Claims and the claims of Equity Security Holders. The Debtor's General Unsecured Claims include Claims arising from trade vendors, suppliers, service providers and judgment creditors. The aggregate amount of the General Unsecured Claims, as reflected in proofs of claims filed by holders of the Debtor's General Unsecured Claims or, in the event no proof of claim was filed, in the Debtor's schedules, is

approximately $1,591,000.00.[9]

Class 5 – Subordinated Unsecured Claims

The Subordinated Unsecured Claims consist of the unsecured claims arising from loans from HEOF. On October 22, 2001, the Debtor and HEOF entered into a demand promissory note in the original principal sum of $60,000 (the "First Note"), together with interest at 8.5% per annum. The First Note, including principal and all accrued interest and unpaid interest was due and payable in full on January 22, 2002. According to the proof of claim filed by HEOF, the balance of the First Note on the Petition Date was $74,098.36.

On or about August 16, 2002, the Debtor and Power Equities, Inc., entered into a promissory note (the "Second Promissory Note") in the original principal sum of $75,000. The Second Promissory Note was subsequently assigned to HEOF. The entire principal balance of the Second Promissory Note, together with all unpaid interest accrued thereon, was due on January 31, 2004. According to the proof of claim filed by HEOF, the balance of the Second Promissory Note on the Petition Date was $92,750.

Class 6 – Equity Security Holders

Class 6 consists of the equity holders of the Debtor. The names and percentage equity interests are outlined above.

## DISCLAIMER

**IT SHOULD BE EMPHASIZED THAT THESE ESTIMATES OF DEBTS AND EXPENSES ARE ESTIMATES ONLY. THE FINAL DETERMINATION OF CLAIMS AGAINST THE DEBTOR WILL BE MADE BY THE BANKRUPTCY COURT. THERE MAY BE LEGITIMATE CLAIMS WHICH ARE NOT REFLECTED ON THE DEBTOR'S BOOKS OF ACCOUNT. IN ADDITION, FINAL ALLOWED CLAIMS MAY BE MORE OR LESS THAN THE AMOUNTS SHOWN ON THE BOOKS. THE DEBTOR HAS ACCRUED ADDITIONAL EXPENSES SINCE THE PREPARATION OF THIS DISCLOSURE STATEMENT, AND WILL CONTINUE TO ACCRUE EXPENSES IN THE FUTURE.**

I.      **Liquidation Analysis as of October 31, 2004**

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met. One of these requirements is that each non-

---

[9] To the extent that a holder of a General Unsecured Claim has a security interest in the assets of the Debtor, those claims are entirely unsecured due to the UCC priority of the security interests of the Secured Tax Claims (see Texas Property Tax Code 32.01 and 32.07) and the secured claim of AMRESCO. In addition, the unsecured portion of AMRESCO's claim ($481,388.32) is included in this class.

accepting holder of an allowed Claim or interest must receive or retain under the Plan, on account of such Claim or interest, property as of the Effective Date of the Plan at least equal to the value such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

For the purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the estate by attempting to sell the business as a going concern. However, the Debtor believes that the circumstances surrounding a liquidation under Chapter 7 would inevitably lead to selling conditions which would substantially detract from the total value returned to the estate.  The following are some, but not all, of the deleterious consequences that the Debtor believes would result from a Chapter 7 liquidation:

- Substantial Chapter 7 administrative costs relating to professional fees, broker commissions, sales commissions and other associated expenses would necessarily be incurred.

- The sale of the Debtor's assets and business under the time pressure and adverse publicity attendant to a Chapter 7 liquidation would create a difficult selling environment and would result in a transaction consummated at a substantial discount to going-concern value.

- A Chapter 7 trustee will be unfamiliar with the Debtor's business at the time of his/her appointment and is not likely to be in a position to market the Debtor during the liquidation period as effectively as management.

Taking such matters into consideration, the Debtor has prepared the following liquidation analysis such that the holders of non-priority general unsecured claims could expect a dividend of zero.  Furthermore, the Debtor expects that the process of winding down the Debtor's affairs, objecting to claims and making dividends would likely take six to nine months.

| Assets: | Current FMV Value | | Liquidation Value | |
|---|---|---|---|---|
| Cash | $ 40,000 | $ | 40,000 | (100%) |
| Inventory | $ 21,996 | $ | 4,339 | (20%) |
| FF&E | $ 96,987 | $ | 14,548 | (15%) |
| Intellectual Property | $ 30,000 | $ | 10,000 | (30%) |
| Leasehold Interest | $ 250,000 | $ | 50,000 | (25%) |
| Deposits | $ 7,475 | $ | 0 | |
| **Total Fair Market Value** | **$ 446,458** | | | |
| **Total Liquidation Value** | | **$** | **118,887** | |
| | | | | |
| Liquidation Administrative Costs | $ 20,000 | | | |

**Creditor Payout according to Priority under §507:**

|  | Claims Amt. | Amt. Paid | |
|---|---|---|---|
| Chapter 7 Administrative Costs | $ 20,000 | $ 20,000 | 100% |
| Chapter 11 Administrative Costs | $ 68,620 | $ 68,620 | 100% |
| Class 1  (Priority Tax Claims) | $ 99,098 | $ -0- | 0% |
| Class 2  (Secured Tax Claims) | $ 53,825 | $ -0- | 0% |
| Class 3  (Secured Claim of AMRESCO) | $1,350,000 | $ 30,267 | 2% |
| Class 4  (General Unsecured Claims) | $1,591,000 | $ -0- | 0% |
| Class 5 (Subordinate Unsecured Claims) | $ 166,848 | $ -0- | 0% |
| Class 6  (Equity Shareholders) | $2,300,040 | $ -0- | 0% |
| **Total** | **$ 5,649,391** | **$ 118,887** | |
| **Liquidation Balance** | | **($5,530,504 )** | |

Under the foregoing analysis, the Chapter 7 and 11 administrative claims would receive 100% of their Claims and the Claimants under Class 3 would receive 2% of its Claim.  All other classes of claimants would not recover any amount of their Claims in a liquidation scenario.

However, based on the representations of AMRESCO, if the case is converted to a case under Chapter 7 of the Bankruptcy Code, AMRESCO will immediately seek relief from the automatic stay and foreclose on all of the assets, leaving a no asset case.  Under this scenario, only AMRESCO will receive a distribution and all other classes of claimants (including administrative claimants) will not recover any amount of their Claims.  The Debtor believes that this would be the likely result if the case is converted to Chapter 7.

**J.      Leases/Executory Contracts**

The Debtor leases the real property located at 419 Travis Street, Houston, Texas 77058 (the "Travis Lease") from Jack Meraia.  The initial term of the Travis Lease commenced on June 1, 1998 and will expire on December 31, 2007.  The Travis Lease contains two five year renewal options, which may be exercised by the tenant. The Debtor is current on all lease payments.  Pursuant to section 365 of the Bankruptcy Code, Cabo has assumed the Travis Lease.

On or about January 12, 2001, the Cabo and Roberson Management, Inc., entered into a management agreement (the "Management Agreement") in which Roberson Management, Inc., provides and maintains an alcoholic beverage permit at the 419 Travis Street location.[10]    In exchange, the Debtor manages the operation of Roberson Management, Inc. in connection with the sale of alcoholic beverages at 419 Travis Street.  The term of the Management Agreement continues from year to year until either party terminates the Management Agreement by 30 day written notice,

---

[10]  Because HEOF is not a Texas limited partnership, the Texas Alcoholic Beverage Code prohibited the Debtor from obtaining a liquor license in its own name.

or the Travis Lease expires, whichever occurs first.  Roberson Management, Inc., does not receive any compensation under the agreement.

For the short term, the Reorganized Debtor intends to assume the Management Agreement in order to maintain its ability to sell alcoholic beverages at the Premises. However, because the proposed Plan provides that the new equity partners of the Reorganized Debtor are Texas residents and/or Texas business organizations, the Reorganized Debtor will be eligible to obtain a liquor license.  In any event, the Debtor believes that the 30 day notice requirement for termination of the Management Agreement is adequate to make alternate arrangements for the sale of alcoholic beverages.

On or about December 12, 2002, the Debtor entered into a lease agreement with Hewlett-Packard Financial Services Company for the lease of various computer equipment (the "HP Lease"). In addition, the Debtor is party to equipment leases with Lane Equipment Company ("Lane Leases"). In which the Debtor leases two Taylor Margarita Machines and two (2) Taylor Air Cooled Freezers.

On or about August 28, 2002, the Debtor entered into an executory contract with Idine Restaurant Group, Inc. (now Rewards Network) (the "Idine Contract"), in which Idine pre-paid for food and beverages and agreed to provide "marketing services" for the Debtor.  Pursuant to section 365 of the Bankruptcy Code, the Debtor rejected the Idine Contract.

The Debtor is party to various License Agreements for the use of the Cabo name and Cabo Concept.  For a detailed description of the License Agreements and their treatment under the Plan, refer to section II, G, 1.2 (pages 19-20)

## K.    Tax Considerations

The last fiscal year for the Debtor ended December 31, 2003.  Cabo Restaurants, L.P., is a Texas limited partnership, and thus all net income or loss, as well as other tax attributes are passed through to the Debtor's partners in accordance with the partner's sharing ratios.

The Plan provides for payment in full of all outstanding ad-valorem property taxes,  past due state sales tax, and past due FICA taxes.

## L.    Objections to Claims

The Debtor plans on filing one or more objections to Claims in this case, including the claim of Kensinger Properties Limited, Darby Suiter and Joe Su.

## M.    Preference Actions.

The Debtor anticipates filing one or more preference actions in this case, including the June 2004 payment to Kathleen Tangney.

**N.      Anticipated Future of the Debtor**

Because the proposed new equity holders of the Reorganized Debtor (as described in the Plan), are not experts in the restaurant industry, Mike and Anthony Roberson, the current management of the Debtor, will continue to manage the day to day operations of the restaurant. Michael Roberson shall earn an annual salary of $92,000 and Anthony Roberson shall earn an annual salary of $75,000.

The Robersons and the proposed new equity holders have discussed the possibility of the Robersons receiving a minority limited partnership interest in the Reorganized Debtor if and when the initial contribution of the new equity investors is returned, plus a 15% return on investment. An agreement has not been reached.

**O.      Litigation**

The following is a description and disposition of recent litigation matters involving the Debtor:

| OPPOSING PARTY | NATURE OF PROCEEDING | STATUS OR DISPOSITION |
|---|---|---|
| Advance Restaurant Finance, L.L.C. | Breach of contract | Stipulation of Judgment for $28,683 |
| U.S. Food Service, Inc. | Breach of contract | Pending |
| Kathleen T. Tangney & Tangney & Associates | Breach of contract | Settled for $50,000 |
| Kensinger Properties Limited, Darby Suiter and Joe Su | Breach of contract | Agreed Judgment for $350,000 |

Virginia Beach Music, et. al., alleges the Debtor has violated federal copyright laws relating to broadcasting certain music at the Debtor's premises. Upon information and belief, the allegations have not been made part of a lawsuit, however, the Debtor's officers have been sued their individual capacity. In addition, on November 22, 2004 the Debtor received notice of possible legal action against it by Lexington Insurance Company ("Lexington") for an alleged breach of contract action. The Debtor disputes any alleged liability to Lexington.

**P.      Affiliates**

Roberson Management, Inc., a Texas corporation, is owned and operated by Michael Roberson and Anthony Roberson. As described above, Roberson Management, Inc., maintains a

liquor license that allows the Debtor to sell alcohol at Premise.  For a detailed description of the agreement between the Debtor and Roberson Management, Inc., refer to roman numeral II of section J above.

Roberson Restaurant Group, Inc., a Texas corporation, is owned and operated by Michael Roberson and Anthony Roberson.  Roberson Restaurant Group, Inc., serves as the general partner of Cabo Montrose, L.P., and holds a .05 percent partnership interest in Cabo Montrose, L.P.

Cabo Montrose, L.P., a Texas limited partnership.  Cabo Restaurants, L.P., owns a 12 percent non-preferred limited partnership interest in Cabo Montrose, L.P.  Anthony Roberson holds a 2.34 percent preferred limited partnership interest in Cabo Montrose, L.P.

**Q.      Other Actions**

After the filing of the Bankruptcy Petition, Wells Fargo automatically drafted $1,397.42 and $3,398.27 in credit card fees which arose pre-petition, in violation of the *stay* provisions of Section 362 of the Bankruptcy Code.  A demand has been made to Wells Fargo, and it is expected that the amounts will be returned to the Debtor, without the necessity of filing an adversary proceeding.

## III.  PLAN

**A.      Summary of Plan**

Due to the collapse of Enron (and thus the Debtor's source of equity funding), the Debtor has recognized for some time that a suitable acquisition transaction or strategic investment would be a desirable outcome for their business.  During the year prior to the filing of their Chapter 11 proceedings, the Debtor sought a strategic purchaser or investor, without producing any formal offers.  Since the Petition Date, potential purchasers and investors have been contacted resulting in only limited indications of interest, with one exception, discussed below.

TLG, L.L.P., whose principals include Sherman Lewis, II and Sherman Lewis, III (together, "Lewis" or "TLG") have offered to invest in the Debtor, and reorganize the business.  Initially, Lewis offered to purchase the assets of the Debtor, but under terms and conditions that were wholly unacceptable to the secured creditor (AMRESCO) and other unsecured creditors.  In addition, as a sale was contemplated, the Debtor anticipated a bid process.  Lewis made its offer as a stalking horse, but conditioned his offer on a topping right.   As stated above, this was unacceptable to various parties, and negotiations between the Debtor, Lewis and AMRESCO ensued.  Prior to these discussions, AMRESCO, which has a first lien security interest well in excess of the value of the assets, filed a motion to lift the stay.  As a result of the discussions held between the Debtor, Lewis and AMRESCO,  Lewis will invest $270,000 cash and Lewis will make a line of credit available to the Debtor of $50,000.  AMRESCO and the Debtor agree that the AMRESCO debt is undersecured. AMRESCO has agreed to an Allowed Secured Claim of $1,350,000.  The Debtor has agreed to pay AMRESCO $150,000 as of the Effective Date of the Plan, and AMRESCO has agreed to a principal reduction of $75,000.  Thus, the AMRESCO indebtedness of $1,826,388.22 is to be resolved as

follows: $481,388.22 will be treated as unsecured, $150,000 will be paid at the Effective Date,[11] the principal will be reduced by $75,000, and the AMRESCO Note will be modified to reflect a new principal balance of $1,125,000 (the "AMRESCO Secured Note").  The AMRESCO Secured Note will bear interest at 9% per annum and be paid in equal monthly payments of $11,410.50 for 180 months.

Of the $270,000 cash infusion, $150,000 will be used to pay down the AMRESCO obligation, $60,000 is designated to pay Administrative Claims, and $60,000 will be used for working capital.  In addition, TLG has agreed to make a line of credit available to the reorganized Debtor for up to $50,000.  The working capital and line of credit, if needed, will be used to fund the shortfall that could occur when road construction on Travis Street restricts entry to the restaurant, and affects revenues.  In addition, the Premises has suffered from some deferred maintenance issues, which is likely to require the expenditure of $10,000 to $20,000 over the next two years.

## B.  Classification of Creditors

The claims of the Debtor's creditors are divided into a total of six (6) classes, not including administrative expenses.  The following table shows the approximate amount of the claims in each class as reflected on the schedules filed in the Chapter 11 proceeding by the Debtor or proofs of claims filed by the creditors, exclusive, unless otherwise noted, of: (i) interest, if any; (ii) amounts paid previously pursuant to court order; and (iii) contingent, disputed, or unknown portions of claims.  These amounts are for illustration only.

| | |
|---|---:|
| Administrative Expenses | $      68,620 |
| Class 1  (Priority Tax Claims) | $      99,128 |
| Class 2  (Secured Tax Claims) | $      53,825 |
| Class 3  (Secured Claim of AMRESCO) | $ 1,350,000 |
| Class 4  (General Unsecured Claims) | $ 1,591,000 |
| Class 5 (Subordinate Unsecured Claims) | $    166,848 |
| Class 6  (Equity Shareholders) | $ 2,300,040 |
| **Total** | **$ 5,649,391** |

## C.  Treatment of Various Classes

Article 4 of the Plan details the treatment of the various classes under the Plan.  It is important to realize that the Plan, if accepted and confirmed, binds each creditor.  However, the liquidation of the Debtor would, in the opinion of the Debtor, result in the claimants in Classes 1, 2, 3, and 4 receiving less than they would under the Plan.

---

[11] Amresco shall be paid a loan modification fee of $5,000 (the "Loan Fee") in connection with the preparation of all required loan documentation.  The Loan Fee will be included in the unsecured portion of AMRESCO's Claim.

Class 1 Priority Tax Claims.  The Texas State Comptroller and IRS have Allowed Priority Tax Claims.  Class 1 claimants will receive from the Reorganized Debtor equal monthly payments in an aggregate amount equal to their respective Allowed Claims, together with interest at a fixed annual rate of 5% over a period through the sixth (6th) anniversary of the date of the assessment of such Allowed Priority Tax Claim (the "Assessment Date").

Class 2 Secured Tax Claims.  The County/City and HISD will receive in full and complete settlement, satisfaction, and discharge of their Secured Tax Claims, cash in an amount equal to such Secured Tax Claims, including any interest on such Secured Tax Claims required to be paid pursuant to section 506(b) of the Bankruptcy Code over a consecutive 30 month period beginning on the First Distribution Date.

Class 3 Secured Claim of AMRESCO.  By Agreement, the AMRESCO Secured Note shall be reinstated with a principal balance of $1,125,000, together with interest at 9% per annum, to be paid on over 15 years.  The AMRESCO Secured Note payments will begin on the First Distribution Date.  In addition, AMRESCO will receive a cash payment of $150,000 on the Effective Date.  In consideration of the $150,000 up-front payment, AMRESCO will reduce the principal balance of the AMRESCO Secured Note by an additional $75,000.  As a result, upon payment of the $150,000 on the Effective Date, the principal balance of the AMRESCO Secured Note shall be $1,125,000.  AMRESCO's security interest in the Debtor's assets and deed of trust on the leasehold interest in the Cabo-Travis location shall remain in full force and effect.

Class 4 General Unsecured Claims.    The Class 4 General Unsecured Claims will receive quarterly cash payments in an amount equal to 5% of their Allowed Claim over a 60 month period with no interest.  The largest Allowed General Unsecured Claim is held by AMRESCO in the amount of $481,388.32.  The Class 4 payments will be paid out of the profits and cash flow the Reorganized Debtor during the 60 months following the First Distribution Date.

Class 5 Subordinated Unsecured Claims.  The Class 5 Claims are not provided for under the Plan.

Class 6 Equity Holders.  The Class 6 Equity Security Holders are not provided for under the Plan.

## IV. GENERAL CONSIDERATIONS IN VOTING TO ACCEPT THE PLAN

### A.  Projections, Valuation

Attached to this Disclosure Statement as Exhibit "E" is a projection of the Debtor's income and expenses for the period beginning April 2005 through March 2008.  The projections reflect the payments to secured and unsecured creditors under the Plan, as well as administrative claimants.  The revenue projections are based upon revenue for the past months, as well as the Debtor's experience in the seasonality of the business.  Payments under the Plan will be generated from the Reorganized Debtor's profits and cash flow.  Risk factors include a reduction in revenues to a point

that the Reorganized Debtor is unable to perform under the Plan.  In addition, a sudden increase in the cost of beef, chicken, fish or shrimp, could affect the Reorganized Debtor's profitability, especially to the extent that menu prices cannot be raised.  These factors, as well as others should be considered by the creditors in voting for the Plan.

There has been no independent third party valuation of the restaurant.  The management of the Debtor, in their professional opinion, believes the total amount of AMRESCO's Allowed Claims greatly exceed the value of the restaurant as a going concern.  The Debtor tested the market by making numerous inquiries of other restaurant owners in Houston, and entered into serious negotiations with only two prospective purchasers, including Sherman Lewis, III.  In addition, AMRESCO tested the market by seeking purchasers of the restaurant, and virtually no party was willing to make an offer near to or in excess of the amount described in the Plan.  The Debtor's position is that AMRESCO'S resources greatly exceed its own; and, that if after searching the market, as the primary secured creditor (AMRESCO has a lien on all of the Debtor's assets), AMRESCO is willing to compromise its secured facility by a factor of over 25%, then its marketing efforts must have been significant.  AMRESCO'S agreement to modify its secured debt is further indication that the value of the assets is materially less than the amount due on their note ($1,826,388.32).

## B.  Alternatives to the Plan

Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful.  These alternatives include: (1) continuation of the Chapter 11 proceedings and development of another, different Plan; (2) conversion to bankruptcy liquidation; or (3) dismissal of these proceedings.  The Debtor believes the proposed Plan to be in the best interest of creditors and the Debtor.  Thus, it does not favor any of the alternatives to the proposed Plan discussed below.  In arriving at that conclusion, the alternative courses are assessed as follows:

1.  Continuation of the Chapter 11 proceeding would be advisable if greater advantage could thereby be attained by improving the position of the Debtor and arranging a better plan of operations.  While continuation of the Chapter 11 proceeding may result in the development of an alternative Plan of Reorganization, the Debtor does not believe that there can be material changes in the operation of Cabo.  The payments provided for under the proposed Plan are consistent with the past and projected income of the Debtor.  Accordingly, the Debtor is unaware of any benefits that might result from continuation of the Chapter 11 proceeding and is unaware of any improvements which could be made to the Plan of Reorganization.

2.  It is believed that liquidation proceedings would be contrary to the best interest of all interested parties.  Based upon the information available to the Debtor, the creditors will receive more under the Plan than they would recover in a liquidation.  Notwithstanding the foregoing, if the

case converts to Chapter 7, the assets of the Debtor will vest with the Chapter 7 Trustee upon appointment by the Court. If the Debtor's assets are liquidated, the amount recovered would be well below book value, due to the special use nature of the property. Most of the Debtor's personal property consists of supplies and equipment used in the operation of a restaurant and have relatively low liquidation value. Further, the appointment of a Chapter 7 Trustee would lead to greater administrative costs to the Estate because liquidation of these assets would be time consuming and expensive. The Debtor believes that in a Chapter 7 scenario, there would be no distributions to the unsecured creditors and priority unsecured creditors, and a reduced distribution to the secured creditors.

3. Dismissal of the proceeding would lead to an unsatisfactory result. Should the proceeding be dismissed, secured creditors and judgment creditors would likely pursue foreclosure actions against the Debtor which would ultimately result in the termination of the Debtor's business with no distribution to its unsecured creditors and a reduced distribution to secured creditors.

The assessment of these alternatives is provided solely for the purpose of full disclosure, and creditors are cautioned that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance of what results will occur if the Plan is not accepted. If you believe one of the alternatives referred to above, or some other alternative, is preferable to the Plan and you wish to urge it (them) upon the Court, you should consult counsel as to the appropriate action.

## C. Additional Specific Considerations in Voting

All of the foregoing give rise in the instant case to the following implications and risks concerning the Plan.

While the Plan provides for some payments at or shortly after confirmation, such payments will be limited to Allowed Claims. Under the Bankruptcy Code, a claim may not be paid until it is allowed. A claim will be allowed in the absence of objection. A claim, including claims arising from defaults, which have been objected to will be heard by the Court at a regular evidentiary hearing and allowed in full or in part or disallowed. While the Debtor bears the principal responsibility for claim objections, any interested party, including the Creditors Committee, if one is appointed, may file claim objections. Accordingly, payment on some claims, including claims arising from defaults, may be delayed until objections to such claims are ultimately settled or a decision is made not to object to such a claim.

## V. RELEVANT INFORMATION-FURTHER INFORMATION

In addition to the Exhibits attached hereto, the following additional documents pertain to the Debtor, or to the Plan and its implementation, and are referred to in order that any creditor who so desires may review a part or all of such documents in addition to the summaries or descriptions of them as contained in this Disclosure Statement:

- The AMRESCO Note and related security agreements
- The Non-Binding Term Sheet Regarding Proposed Bankruptcy Settlement Between AMRESCO and Cabo Restaurants, LP.
- The Roberson Management Agreement
- The Licensing/Royalty Agreements
- The Travis Lease Agreement
- The Monthly Operating Reports filed for July 2004 through December 2004

Copies of the foregoing documents (or, if they are not yet in final form, then copies of the latest available drafts thereof) may be obtained from:

> Bennett G. Fisher
> Fisher & Associates
> 1800 Two Houston Center
> 909 Fannin Street
> Houston, Texas 77010
> Tel  (713) 223-8400
> Fax (713) 609-7766
> email: bgf@fisherlaw.net

In addition, any creditor who desires any further information regarding the Debtor or the Plan, should direct his or her inquiry to the above address and telephone number.  No person, other than Debtor and Debtor's counsel, is authorized to furnish any information on which a creditor is entitled to rely in connection with such creditor's acceptance or rejection of the Plan.

## VI. CONCLUSION

This Disclosure Statement contains information intended to assist the Debtor's creditors in evaluating the Plan of Reorganization.  If the Plan is accepted, all creditors of the Debtor will be bound by its terms.

The Debtor urges each creditor to read the plan carefully and to use this Disclosure Statement, the other Exhibits hereto, and such other information as may be available to the creditor to make an informed decision on the Plan.

DATED: February 2, 2005.

CABO RESTAURANTS, L.P.                    ATTORNEYS FOR THE DEBTOR:

                                          Fisher & Associates

By:  /s/ Michael Roberson
     Michael Roberson, President of        /s/ Bennett G. Fisher
     Roberson Hospitality, Inc., its      Bennett G. Fisher
     General Partner                      Texas Bar No.: 07049125
                                          T. Josh Judd
                                          Texas Bar No.: 24036866
                                          1800 Two Houston Center
                                          909 Fannin Street
                                          Houston, Texas  77010
                                          Tel: (713) 223-8400;
                                          Fax: (713) 609-7766
                                          email: bgf@fisherlaw.net


Exhibit A - Plan
Exhibit B - Sample Ballot
Exhibit C - Debtor FF&E and attached value
Exhibit D - MOR Summary (July through December 2004)
Exhibit E - Projections
Exhibit F - Historical Monthly Revenues
Exhibit G - Resume of Sherman Lewis, III